GEORGE VAN BUREN v. STATE OF NEBRASKA.

FILED JANUARY 8, 1902.   No. 12,017.

1. **Evidence**: VERDICT.   Evidence examined, and *held* sufficient to sustain the verdict of guilty returned by the jury.

2. **Conflicting Testimony.**   Where the testimony is conflicting, and is fairly submitted to a jury, a new trial will not be granted if the testimony is sufficient to sustain the verdict.  *Murphy v. State,* 15 Nebr., 383.

3. **Credibility of Witness**: RELATIONSHIP: INSTRUCTION.   In an instruction in a criminal prosecution to the jury relating to the credibility of witnesses and the weight to be attached to the testimony of each, it is not error to charge that the jury should consider the relationship, if any is shown, of any witness to the defendant.

ERROR from the district court for Cherry county.   Tried below before WESTOVER, J.   *Affirmed.*

*Hamer & Hamer, John M. Tucker* and *E. D. Clarke,* for plaintiff in error.

*Frank N. Prout, Attorney General,* and *Norris Brown, Deputy,* for the state.

HOLCOMB, J.

The defendant below, plaintiff in error, was informed against and convicted of stealing a two-year-old steer, the property of one William Ferdon, of the value of $30.   He prosecutes error to secure a reversal of the judgment of the trial court by which he was sentenced to be imprisoned in the penitentiary for the period of four years and adjudged to pay the costs of prosecution.

But two questions are presented in the brief of counsel for defendant as grounds for a reversal, one of which only is deemed deserving of more than a passing notice.   It is urged strenuously that the evidence in support of the charge is insufficient to sustain the verdict of guilty re-

turned by the jury, and for that reason the judgment rendered thereon can not stand. To this question we will first address ourselves. The theory of the state is that the steer charged to have been stolen was the property of the person mentioned, who was a stockman having many cattle on the range belonging to him and kept in Cherry county, all of which were branded by what is denominated a "box T brand"; that the animal involved in the controversy was a part of his herd, belonging to him, and was branded by the owner with the brand mentioned when a calf; that afterwards it was stolen by the defendant, into whose possession it was traced, and who had recently sold it to another party living in the same county, that the box T brand then on the animal had been burned over and altered so as to make it appear as what is called a "double cabin brand." The defendant's theory was that the animal had been raised by his r' pfather from a cow belonging to a small herd of some fourteen or fifteen head of which he was the owner; that when about a year old it was branded for the first and only time with the double cabin brand, which was accomplished by the use of different irons and a rod of a larger size, by tracing the figures made with the hot end of the irons, and that, the first attempt not being successful, the figures or some of them were burned deeper with the larger iron; that before the animal was so branded the stepfather sold the animal, with three others, to the defendant, who in turn sold it to the party from whom it was recovered as the property of the alleged owner, Ferdon. After the recovery of the animal, the prosecution in the case at bar was begun. It is contended that the testimony of the state's witnesses as to the animal being branded with the box T brand is in its nature only an opinion, guess or surmise, and therefore insufficient to establish the fact sought thereby; and that there was no direct evidence that the animal ever belonged to or was the property of Ferdon, even if the evidence warranted the inference that it had been branded with the box T brand. As to the latter, the evidence is positive and direct to the effect that Ferdon

was the owner of all the cattle in that county branded as mentioned, and, although neither he nor any other person could identify the animal as belonging to him otherwise than by the brand, we regard the evidence sufficient to justify the finding that the property belonged to him, and was stolen by the defendant, in whose possession it was found, and who claimed the ownership thereof, and had disposed of the animal as his own, if it be conceded that it had been branded with the marks and evidence of owner-ship of Ferdon; there being nothing in the evidence to show or tending to prove that other cattle were similarly branded, and no explanation offered as to how the brand came to be found on the animal inconsistent with Ferdon's claim of ownership of all such cattle. The brand itself, with the evidence in relation to its use, and upon whose cattle it was placed, was sufficient evidence of ownership.

As to the evidence relating to the brand found on the animal soon after the defendant had disposed of it, and whether it was a box T brand, for the sake of brevity we can only give brief extracts from the testimony of a few of the state's witnesses in order to show the character and tendency of such evidence to establish the fact sought as to the alleged larceny, which rested primarily on the prop-osition that the animal was the property of Ferdon, and branded by him as his property when a calf. Ferdon, after testifying as to his cattle, where they ranged, the brand he used to show his ownership, when he branded, and his general experience with branding cattle as a stockman ex-tending over some twenty-five years, gave testimony as fol-lows:

Q. Now, what brand did you observe upon this animal here in town before it was slaughtered?

A. The first thing was a box T.

Q. How did the box T—the lines—appear upon the ani-mal in his lifetime as you observed it then?

A. I don't think I understand you.

Q. How did the lines of the original box T appear upon the animal when you seen it here in town?

A. They were much plainer. Just as if this was the plain brand, and these pencil marks had been added to it, they were merely shaded a little. (Witness shades the diagram of the brand with pencil to indicate what he is saying.)

Another witness, who was a stock inspector employed by different stock associations, and who was well qualified to testify regarding brands and rebranding cattle, testified:

Q. After having done so, what did you do with reference to determining what brand was on that animal?

A. I went to work, and had a butcher kill him.

Q. What did you do before that?

A. I clipped the hair off of him.

Q. For what purpose did you have him slaughtered?

A. To see whether the brand would show on the inside as well as on the outside.

Q. What brand did you discover on the steer when you got him clipped?

An objection was interposed and sustained.

Q. Well, before the clipping, what brand could you see and notice on the animal?

A. The open box T.

Q. Look at Exhibit A, and state what that brand is,— what you call that brand?

A. I call it an open box T.

Q. Could you see that brand on the animal before it was clipped?

A. I could.

Q. Could you see any other brand?

A. I could not before it was clipped.

Q. After it was clipped you could see other brands on it, could you?

A. Yes, sir.

Q. State to the jury what you could see in the way of additional brands upon the animal after he was clipped and before he was slaughtered.

A What some of them call a "double cabin."

Q. Examine the brand that is on this piece of hide, and

state if that is the brand you saw on the animal after it was clipped and before it was slaughtered?

A. It is after I clipped it.    Before I clipped it, I couldn't see this part of it and those bars under it.

Q. In your experience have you ever had occasion to observe the effect that it has, if any, to reburn the lines of an old brand,—what effect it has upon the hide of the animal?

A. Yes sir; I have seen a good many of them burnt over.

Q. What effect does it have on the hide of the animal?

A. It makes them a good deal larger where you burn over, and it will always show.   Whenever a brand is burnt over, it will show plainer, and it will show from the under side, when the skin is taken off the animal, more than the first brand that was put on the animal.

Q. Then I understand you to say that the reburning would increase the thickness and size of the lines?

A. Yes, sir, that is what it does.

Q. Now state if you ever had occasion to observe what effect it has upon the transparency of the lines, after the animal is slaughtered and the hide dried?

A. I don't understand.

Q. I mean the transparency of the lines, as in holding it up to the light.   I will ask you to state what effect the reburning has in increasing the transparency?

A. It always shows a great deal plainer if it is burnt over.

Q. It would be more transparent when held up to the light?

A. Yes, sir.

Q. Now, take the hide, and point out to the jury the lines that have been reburnt.

A. (Witness takes the piece of hide and indicates to the jury) : There is the brand on the hide, right there.

Q. Trace first the lines upon that which have been reburnt in your judgment.

A. Right here, and down there, and across here.   (Witness indicating on the piece of skin with pencil so that the jury can see.)

Q. And that would make the box T with the exception of this line here?

A. There is where it has been burnt over; right here, and across here, and right down through here; that is where it has been burnt over.

Another witness testified:

Q. Describe the steer.

A. It was a roan two-year-old steer.

Q. Did you observe any brand upon him?

A. Yes, sir.

Q. What brand?

A. It was a box T,—open box T.

Q. That is, a brand similar to the one indicated on state's Exhibit A?

A. Yes, sir; the same brand.

And yet another witness:

Q. Have you observed any brands that had been worked over?

A. Yes, sir.

Q. Do you remember being called over to Walcott's livery stable to inspect a steer that was there?

A. I wasn't called over. I went over to see the steer that was there.

Q. You saw him there, did you?

A. Yes, sir.

Q. Will you describe him?

A. He was a two-year-old roan steer.

Q. Did he have a brand on him?

A. Yes, sir.

Q. Describe the brand.

A. Well, the brand is there on that hide that I saw on him there. I first went over to see the steer, and the first thing I could see was the box T. It was very open. The other was put on kinder light. The brand was put on where the box T was.

Q. What do you say as to the lines of the box T having been burnt over?

A. In an old brand you have got to burn it pretty hard to

make it appear like the other, because in an old brand is kinder grisly.

Q. Do any of these lines have the appearance of having been burned over?

A. I would think so, yes, sir.

Q. Now, Mr. Quigley, I will hand you this brand on this piece of hide, and ask you if that is the same brand you observed on that steer?

A. Yes, sir.

Q. Will you point out the lines of the box T to the jury?

A. (Witness takes piece of hide and indicates to the jury the lines of box T.)

Q. Did these lines stand out prominently on the steer in his lifetime?

A. Yes, sir; they stood out pretty plainly, I should judge.

Much other testimony of the same general character was given. There was also evidence tending to prove that when a brand was burned deeper immediately after the first branding,—as was the contention of the defendant as to the time and manner in which the brand was placed on the animal,—and when a considerable period of time elapses and the flesh becomes hardened and calloused from the first burning before the brand is burned over a second time,—as was the theory of the state,—the effect is entirely dissimilar, and that from the experience of those competent to judge and express an opinion sufficient time for the flesh to heal from the first branding had elapsed before what is called the "double cabin brand" was placed on the animal. The evidence was the best obtainable. It was positive, direct and to the point. The testimony was given by those experienced with branding cattle, the effect on the hide of the animal, the peculiarities and distinguishing features when brands are burnt over, and how the same may be detected and recognized. Its evident direct tendency was to establish the fact that the animal had been first branded when a calf with a box T brand, such as used by Ferdon to mark his cattle running on the range and as evidence

of his ownership, and that some time afterwards, and when the burned flesh caused by the brand thus placed on the animal had healed, there were added to the marks forming the box T brand others, and the first brand burned over so as to form the double cabin brand found on the animal at the time the prosecution began. The evidence is, we regard, quite sufficient to warrant the jury in finding that the property was branded with a box T brand, belonged to Ferdon, was feloniously taken from him, and that the defendant was guilty of the offiense.

It is true that the testimony of the witnesses for the state and those for the defendant was in sharp and direct conflict, but this only raised a question of fact to be determined by the triers of fact, which were the jury, and their verdict on conflicting evidence should not be disturbed unless clearly wrong, which can not be said to be the case in the present instance. The credibility of the witnesses and the weight to be attached to the testimony of each was peculiarly a question for the jury. It was for them to search for the truth and then declare it by their verdict; and where the questions of fact were fairly submitted, as we think was done in this case, and there is sufficient evidence to support the verdict, it can not rightfully be disturbed. *Murphy v. State*, 15 Nebr., 383.

In an instruction given to the jury as to the weight to be given the testimony of the different witnesses it is, among other things, said: "You should also consider the relationship, if any is shown, of any witness to the defendant, the demeanor of the witness upon the witness stand, his apparent intelligence or want of intelligence, whether his testimony is given promptly, clearly and intelligibly." Objection is made because of mention being made of the relationship of witnesses to the defendant. The objection is not a valid one. Relationship of witnesses to parties to litigation may always be shown and considered in determining the weight to be given the testimony of such witnesses. If proper to be considered, no complaint can be made because the jury's attention is called to the rule by

an instruction of the court. The rule is quite elementary and needs no elaboration. Wharton, Criminal Evidence [8th ed.], sec. 376.

The judgment ought to be, and accordingly is,

AFFIRMED.